*The final accounting in the Estate of* CHARLES F. PRESCOTT.

AN administrator was held to the appraised value of assets in his inventory, where he had undertaken to carry on a business and thereby lost assets of the estate. Where he trafficked with his own firm, and paid himself without proof, the payment was disallowed. Where he deposited trust moneys in ·bank, or loaned them without interest to his firm, he was charged with legal interest.

SANFORD & WOODRUFF, *for Administrator.*
F. G. MCDONALD, *special Guardian for infant next of kin.*

CHARLES F. PRESCOTT died in the city of New York

intestate, and letters of administration were issued on the 30th of October, 1867, to Dexter B. Britton, a creditor, upon the renunciation of the widow and the Public Administrator, there being no general guardian of his only child, the next of kin, who was an infant.

On the 23d of December, 1867, an application was made to the Surrogate, by the widow of the intestate, that additional security be required of the administrator, and a citation was issued requiring the administrator to show cause why he should not furnish further security or be removed, together with a temporary injunction enjoining him from further acting as administrator until the matter in controversy should have been disposed of. No appearance being made by either the widow or the administrator on the return day of the citation, this proceeding was dismissed. On the 12th of November, 1867, the administrator filed his inventory of assets, appraised at $17,168.48. On the 16th of August, 1869, he filed his final account, whereby he charged himself with the amount of the inventory and with increase from rents of leasehold, income and miscellaneous receipts, of $40,280.07, making a total with which he charged himself of $57,448.53. He credited himself with amount of loss on sales of property appraised in the inventory, of $6,117.48; with appraised value of assets received, $2,301, and with moneys paid for necessary expenses for the estate (including $150 widow's allowance paid to widow), of $42,755.24. He found a balance in his hands, for the payment of commissions, expenses of the accounting and distribution to claimants and next of kin, of $6,274.83. The special guardian for the infant objected to this account. Whereupon the Surrogate directed the administrator to be " examined on oath, touching his payments, and touching any property or effects of the deceased which had come to his hands, and the disposition thereof." (3 *R. S.*, 5th ed., p. 179, § 60 [54].) Upon this examination argument was had, and the Surrogate delivered his decision.

THE FINAL ACCOUNTING IN THE ESTATE OF CHARLES F. PRESCOTT.

THE SURROGATE. The personal property belonging to the intestate was the lease, stock, fixtures, furniture and business of the public house known as Lafayette Hall, and Lafayette Hotel, on Broadway, in this city, which were inventoried, soon after his death, at $17,168.48. The administrator took charge of this business, and conducted it up to May, 1869, when he sold it for $8,750. He did not conduct the business in person, but appointed agents. The "hotel department" was managed by Lloyd L. Britton, and the "hall department" by Robert Brown and, afterwards, Alfred Spink. The "hall" was a bar and billiard saloon. The sale of the concern was in May, 1869, at public auction. The lease, fixtures, and every thing were sold, "in a lump," to J. B. Stead for $8,750; of which $2,000 was paid to the administrator in cash, and the balance soon after. The administrator pretends that he was prevented by my injunction from selling the property earlier, but this is a mere excuse, as he never obeyed the order to show cause, if one was ever served upon him (of which there is no proof in this office), and never applied to vacate the injunction. Indeed, he does not pretend that he obeyed it at all. He went on with the business, through his agents, and continued to act as administrator in disposing of the assets at retail, although he now professes to have been prohibited by the injunction from disposing of the whole property at auction. It is quite evident that the injunction was obtained and used as a cover for the mismanagement of this estate, and that the application for it and use of it were a fraud upon the Court.

The administrator authorized his agents, Brown, and subsequently Spink, to purchase all the liquors for the "hall," and all the ordinary expenses after the 1st of January, 1868, were incurred by Spink. He paid all the ordinary bills and running expenses. He accounted to the administrator at intervals for the moneys received, over and above the amounts he had paid out. Two or

three times a week Spink would pay over to the administrator. When the rent became due, the administrator would pay it himself. Brown, during his agency, did the same that Spink afterwards did. Both Brown and Spink kept books. On receiving the money from the hotel and hall, the administrator deposited part of it in banks, in his own individual name, and not as administrator, mixing it with his own individual funds. He obtained individual discounts from those banks. What the administrator did not so deposit in banks, he loaned to the firm of D. B. Britton & Co., liquor dealers, of which he was a member. The firm paid no interest on these loans. The administrator did not remember what salary he paid Lloyd L. Britton, as agent, but thinks it was $2,000 per year.

At the time of the intestate's death the furniture in the hotel and the billiard tables in the hall were new. During the conduct of the business, this inventoried property became less valuable in consequence of its use in the business.

The administrator says the estate was generally indebted to him individually, while he was carrying on this business for its benefit, and he had sometimes to advance the rent when it fell due. He called the creditors together several times and consulted them; he finally "got tired of carrying the thing on," and told the creditors he wished it sold, and advertised and sold it at auction. He was constantly making efforts to sell this property, every week.

Such is the testimony of the administrator in relation to a property which in his hands has fallen from $17,000 to $6,000, without his having paid a single debt on the estate.

In restating his accounts, we will begin by charging him with the $17,168.48, amount of the inventory. The footings of an inventory and appraisal are presumptively the fair value of the assets. The Ecclesiastical Courts

have always strenuously insisted on the making and filing of an inventory as the very first duty of an administrator or executor, and our Revised Statutes make the same requirement. It is to charge the administrator. It is not a mere form. There must be absolute evidence that the sale of the assets was fair and such as one would have made of his own goods, and that due diligence was used in making the sale at the earliest possible moment, to excuse so great a depreciation of the value of the assets. I cannot certainly allow the goods appraised at $17,000 to be sold for $6,000, after eighteen months unprofitable use, and without a satisfactory explanation of the deterioration. The administrator must be held to the amount of his inventory.

It is a sound and well established principle, that if an executor will undertake to act in any other manner than his trust requires, he puts himself into this situation: that if there be any loss he must replace it, while he can have no profits. (*Williams or Executors*, 1669, 1670.) The letters of administration did not require the administrator to carry on the business of keeping a hotel and billiard saloon for eighteen or nineteen months; and if loss has resulted from his thus dealing with the assets entrusted to him, he is accountable to and must make good the estate.

The administrator does not come into Court with clean hands, as respects other matters of his account. He appears to have dealt and trafficked with the estate through the firm of which he was a member. The vouchers filed in this accounting show that the wines and liquors sold over the counter of this establishment for all the time he was conducting its business were furnished by and paid for to the firm of D. B. Britton & Co. Mr. Brown or Mr. Spink, his agent, ordered and paid for them, except one bill, amounting to $2,583.77, for "balance on liquors," which the administrator himself paid to his own firm on 5th June, 1869, after the business was

closed and sold out. This payment must be disallowed for the reason that the administrator testifies that all purchases of liquors were made by Brown or Spink, and that the bills for such purchases, made by the agents, and filed as vouchers, appear to be receipted in full, leaving no balance due at the time of this payment.

There are errors in the administrator's sworn account, in his own favor, which the production of his cash books has corrected. He charged himself in his schedules with receipts from Lafayette Hall, of $3,034.50, while the cash book shows receipts of $3,500.00. He charges himself with $100, received January 6th, 1868, while his cash book charges him with $125. This additional $490.50 must be added to the charges against him.

The administrator is chargeable with legal interest upon the amount he is to account for, to be calculated from the date of receipt, or from the date when it should have been received. Being a member of the firm of D. B. Britton & Co., he has loaned funds of the estate to his firm without interest.

The rule is laid down in *Schieffelin* v. *Stewart*, 1 *Johns. Ch. R., p.* 620 : " If an executor, administrator or trustee apply trust money to his own use, or employ them in his business or trade, he is chargeable with compound interest." And this doctrine is reaffirmed in *Garniss* v *Gardnier* 1st ed. *Ch. R., p.* 129 ; *and DePeyster* v. *Clarkson* (2 *Wend. R., p.* 77.)

This administrator also deposited trust moneys in his own name, in banks at which he was in the habit of obtaining discounts. This is a use. (*Rock* v. *Hart*, 11 *Vesey, p.* 59.) The Master of the Rolls said :

" I agree with Lord Loughborough, that if a trustee lodges trust money with his bankers, he has, in effect, a benefit from that, as he must generally keep a balance at his bankers, which answers the purpose of his credit as if it was his own money, and I should hold that to be employment in his trade.

" And it should seem to be now settled, that an executor, who being a trustee, and having of course an account with a banker, places the assets at his bankers in his own name, by that means increasing the balance in his favor, acquiring additional credit and enjoying in his business the advantages naturally arising from that circumstance, must be considered as having employed the money for his own benefit, and must therefore be charged with interest, at five per cent." (2 *Williams on Exrs.*, *p.* 1,312.*)

The accounts must be restated under these rulings, and decree drawn.